1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TERRENCE BROWNLEE,

11          Plaintiff,                    No. CIV S-02-0214 MCE GGH P

12      vs.

13   MURPHY, et al.,                      ORDER &

14          Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17          Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18   1983.  Pending before the court is 1) plaintiff's motion to compel further discovery, filed on

19   April 11, 2005, to which defendants filed their opposition on April 14, 2005; 2) defendants'

20   motion for summary judgment, filed on April 14, 2005, to which plaintiff filed his opposition on

21   May 2, 2005; [1] and 3) plaintiff's "notice of failure to comply with discovery," construed as a

22   \\\\\

23   _____

24          [1] Among plaintiff's May 2, 2005 filings, one is entitled "incomplete documents issued by
     defendants" wherein he complains of not having been provided with several pages of his
     deposition along with defendants' separate statement of undisputed facts; defendants, on May 5,
25   2005, responded that those portions not attached to the motion for summary judgment were not
     relied on by defendants but nevertheless defendants aver that, in response to plaintiff's request,
26   the missing pages were mailed to plaintiff.  The court deems this matter resolved.

1

1  motion to compel discovery responses, filed on May 27, 2005, to which defendants filed their

2  opposition on June 6, 2005.

3  Complaint

4          This action[2] proceeds on the original complaint, filed on January 25, 2002, as

5  modified by the Order, filed August 28, 2002, adopting the June 12, 2002 Findings and

6  Recommendations of the undersigned and further modified by the Order filed on August 8, 2002,

7  adopting the June 17, 2003 Findings and Recommendations, dismissing several defendants

8  pursuant to Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364 (1994).  Plaintiff's state law tort

9  claims have also been dismissed.  See Order, filed on March 17, 2005, adopting Findings and

10  Recommendations, filed on January 21, 2005.

11          Plaintiff alleges that on January 18, 2001, he was subjected to excessive force in

12  violation of the Eighth Amendment when defendants Murphy, Snyder, Lytle and Prado,

13  "rushed" him; these defendants comprised several of a number of correctional staff "involved in

14  a confrontation with other inmates," occurring a few minutes prior to the time plaintiff was

15  "assaulted."  Complaint (cmpl.), pp. 8-10.[3]  Plaintiff had been using the phone and was not

16  involved in the immediately preceding altercation.  Cmpl., p. 11.  Plaintiff states that he was

17  ordered back into another section by defendant Snyder, but that the door would not open because

18  some 40 inmates were trying to get out.  Cmpl., p. 9.  Plaintiff, allegedly having witnessed two

19  inmates being beaten by staff, avers that he told defendant Snyder that what was happening was

20  wrong, after which defendant Murphy purportedly ordered that plaintiff be cuffed and taken,

21  along with others, "to the hole."  Id.  It was then that plaintiff claims that defendants Murphy,

22

23          [2]  The court sets forth its summary of the underlying complaint included in the October
24  21, 2003 Findings and Recommendations (adopted by Order filed on December 23, 2003), in the
    July 12, 2004 Findings and Recommendations (adopted by Order filed on September 10, 2004),
25  and in the Order filed on March 14, 2005, with any applicable subsequent modifications.

26          [3]  The court is using the page numbering inserted by plaintiff, beginning with the form
    complaint and continuing onto attached pages.

2

1   Snyder, Lytle and Prado, as well as others unnamed, converged on plaintiff with plaintiff's hands

2   being pulled behind him by defendants Snyder and Prado and with his right leg pulled up behind

3   him "in the air as far as Sergeant Murphy and Sergeant Lytle could push it." Cmpl., pp. 9-10.

4   Plaintiff claims that his back began to hurt at that point, but nothing was done for him by an

5   unnamed M.T.A., brought to plaintiff by a non-defendant officer, on that occasion. Cmpl., p. 10.

6          Plaintiff states at his "C.D.C. 114D" (or C.D.C. 115 rule violation) disciplinary

7   hearing, held on January 25, 2001, arising from the subject incident, that he had told staff that

8   they were "doing the wrong" [sic] to the two inmates allegedly being beaten on that occasion. Id.

9   Thereafter, on or about January 27, 2001, plaintiff claims that he filed an inmate appeal form,

10  which was purportedly returned to him, with the warning that if he did not drop the appeal, he

11  would be sent "to the hole;" nevertheless, plaintiff re-filed an inmate appeal on February 25,

12  2001. Id.

13         Although it is unclear from his allegations, it appears that plaintiff's back went

14  untreated from January 18, 2001 until May 8, 2001, at which point his back "'went out'" and he

15  had to be "rolled down to see a physician." Cmpl., pp. 10-11.  Plaintiff claims to have lain for

16  hours before receiving a shot for his pain. Id., p. 11.  After a few more hours, plaintiff states that

17  he told an M.T.A. that he could not stand, much less walk; another inmate helped plaintiff to

18  stand and, an hour later, he was able to move by himself.  Id.  On May 16, 2001, plaintiff was

19  provided with a cane due to his back pain by defendant Dr. Penner.  Id.  Defendant Penner

20  ordered three lumbosacral x-ray views of plaintiff's spine (which were taken on May 11, 2001),

21  but plaintiff claims that since January 18, 2001, he has not received medical treatment for his

22  back, which continues to give him intense pain, of which defendant Penner and other medical

23  staff are aware.  Compl. at pp. 11-12.  Thus, plaintiff claims that defendant Penner has provided

24  inadequate medical care in violation of the Eighth Amendment.  Plaintiff seeks relief in the form

25  of money damages only, including compensatory and punitive.

26  \\\\\

1  <u>Motions to Compel</u>

2       <u>*Plaintiff's April 11, 2005 Motion*</u>

3              At issue in plaintiff's April 11, 2005 motion to compel is plaintiff's contention

4  that defendants failed to comply with the court's March 14, 2005 order (wherein the undersigned

5  adjudicated motions to compel brought by plaintiff and defendants), in one specific part.

6  Plaintiff objects to defendants' supplemental response with respect to one production request

7  seeking any record of informal or formal discipline contained in defendants' personnel files

8  arising from complaints of excessive force by inmates.  Motion to Compel, p. 2.

9              Defendants argue that they have complied with the court's order as to the issue

10 plaintiff raises, citing both their response and the court's order.  Opposition, pp. 2-3.

11 Defendants' contention is well-taken.

12             Plaintiff takes issue with the supplemental response provided to the following

13 original request and response:

14
                  1.  Any and all investigations, complaints, on defendant Murphy,
15                Lytle, Snyder, Prado, for the use of excessive force.
                  <u>Response</u>
16                Defendants object to this request on the grounds that it is over
                  broad and burdensome.  If interpreted to include inmate appeals
17                alleging excessive force, the request would require a search of
                  potentially thousands of documents.  The request is also objected
18                to on the grounds that it could include information regarding other
                  inmates or the defendants' private information.  The California
19                Information Practices Act prohibits inmates from having access to
                  information regarding another inmate.  Civ. Code §§ 1798.24,[4]
20                1798.40;[5] Cal. Code Regs., tit. 15, § 3370.[6]  Without waiving these

21  _____

22        [4] Cal. Civ. Code § 1798.24 sets forth the limited conditions under which a state agency
    "may disclose any personal information in a manner that would link the information disclosed to
23  the individual to whom it pertains...."

24        [5] Cal. Civ. Code § 1798.40 sets forth the circumstances under which a state agency is not
    required "to disclose personal information to the individual to whom the information pertains."

25        [6] Cal. Code Regs. tit.15, § 3370 governs the access and release of case records file material
    of state prisoners, including, e.g., under § 3370(a), the provision that "[n]o inmate or parolee
26  shall access another's case records file or file material."

                                        4

1       objections and limiting the scope of the search to institutional fact
finding inquiries and internal investigation reports, see attached.

2

3  In the March 14, 2005 <u>Order</u>, after analysis of the parties' arguments, the issues raised and the

4  applicable law, in relevant part, the court set forth the following:

5       Defendants Murphy, Lytle, Snyder, and Prado will be required to expand
their search and production to include any record of informal or formal

6       discipline contained in their personnel files, arising from investigations of
claims or complaints of excessive force by inmates, including reprimands,

7       if any such records exist.  In their production, defendants should redact the
name and identification of any inmate, as well as any personal data

8       pertaining to each of them (defendants), such as their social security
numbers, home addresses, and birthdates of the defendants.  If no such

9       documentation exists as to any or all defendants, defendants must so
inform plaintiff.  Therefore, as tailored herein, plaintiff's motion is granted

10      as to this request and defendants must file proof of service upon plaintiff
of their further response and production, as appropriate, within fifteen days

11      of the filing of this order.

12       Defendants provided the following supplemental response (the proof of service of

13  which was filed timely on March 28, 2005), with which plaintiff takes issue:

14       <u>Supplemental Response to Request for Production No. 1</u>:

15       Defendants Murphy, Lytle, Snyder and Prado cannot produce any
record of informal or formal discipline contained in their personnel

16       files, arising from investigations of claims or complaints of
excessive force by inmates, including reprimands, because no such

17       records exist.

18       Although plaintiff is dissatisfied with this response and asks the court to engage in

19  an investigation of the veracity of this representation, plaintiff has previously been informed (in

20  the March 14, 2005 order) that the court cannot order defendants to produce records which they

21  have represented do not exist.  The deputy attorney general who is counsel for defendants signed

22  the supplemental response and the document is subject to the provisions of Fed. R. Civ. P. 11(b),

23  and the sanctions under Rule 11(c) for any violation thereof.  Plaintiff's motion for any further

24  production or a court-appointed investigator is denied.

25  \\\\\

26  \\\\\

1    *Plaintiff's May 27, 2005 Motion*

2           Plaintiff served several new document production requests upon defendants, on or

3    about May 3, 2005, according to his submission, that is, apparently after the filing of his

4    opposition to defendants' motion for summary judgment.  Plaintiff relies on the court's

5    November 22, 2004 order, wherein the pretrial conference and jury trial dates set in the

6    scheduling order, filed on February 20, 2004, were vacated (in order for the court to adjudicate

7    what at the time were construed to be dispositive motions then pending), as the basis for his

8    erroneous premise that the discovery deadline set in the scheduling order had also been vacated.

9    Defendants are correct that the discovery cut-off set in the scheduling order was June 4, 2004.

10   Opposition, p. 2.

11          The court never expressly vacated the discovery deadline set in the scheduling

12   order; however, although no party so notes, the undersigned did grant defendants extensions of

13   time to file discovery responses by orders, filed on April 23, 2004 and on April 27, 2004, as well

14   as an extension of time until June 18, 2004 to file a motion to compel discovery, by order filed

15   on June 14, 2004.  Moreover, the court also, as noted above, adjudicated the parties' then

16   pending motions to compel discovery in an order filed on March 14, 2005, expressly ordering the

17   parties to provide certain further responses within 15 days of that order.  Finally, the court has

18   adjudicated a further motion of plaintiff's herein immediately above which was related to the

19   additional discovery previously ordered.  However, the court's order in adjudicating motions to

20   compel discovery, unless it so expressly states, does not have the effect of extending the

21   discovery deadline previously set for the parties to continue propounding discovery requests.  In

22   this case, the court did not grant the parties leave to continue to conduct discovery beyond, other

23   than that set forth above, the discovery cut-off.

24          Plaintiff has no grounds for his apparent assumption that he has unfettered license

25   to serve discovery request upon discovery request on defendants far beyond the expressly set

26   deadline, especially without having sought leave of court.  Plaintiff's motion to compel responses

6

1   to discovery requests filed far beyond the discovery deadline, and without having sought the

2   court's permission to do so, is denied.

3   Motion for Summary Judgment

4                    *Legal Standard for Summary Judgment*

5           Summary judgment is appropriate when it is demonstrated that the standard set

6   forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

7   there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

8   as a matter of law."  Fed. R. Civ. P. 56(c).

9           Under summary judgment practice, the moving party

10          always bears the initial responsibility of informing the district court
            of the basis for its motion, and identifying those portions of "the
11          pleadings, depositions, answers to interrogatories, and admissions
            on file, together with the affidavits, if any," which it believes
12          demonstrate the absence of a genuine issue of material fact.

13  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

14  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

15  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

16  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

17  after adequate time for discovery and upon motion, against a party who fails to make a showing

18  sufficient to establish the existence of an element essential to that party's case, and on which that

19  party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

20  failure of proof concerning an essential element of the nonmoving party's case necessarily

21  renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

22  granted, "so long as whatever is before the district court demonstrates that the standard for entry

23  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

24          If the moving party meets its initial responsibility, the burden then shifts to the

25  opposing party to establish that a genuine issue as to any material fact actually does exist.

26  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356

                                                7

1    (1986). If the moving party meets its initial responsibility, the burden then shifts to the opposing

2    party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

3    Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In

4    attempting to establish the existence of this factual dispute, the opposing party may not rely upon

5    the allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material, in support of its contention that the

7    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n.

8    11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

9    might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby,

10   Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.

11   Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the

12   evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool

13   v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

14          In the endeavor to establish the existence of a factual dispute, the opposing party

15   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

18   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19   genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

20   56(e) advisory committee's note on 1963 amendments).

21          In resolving the summary judgment motion, the court examines the pleadings,

22   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24   477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

25   placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

26   at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

1  opposing party's obligation to produce a factual predicate from which the inference may be

2  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

3  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

4  party "must do more than simply show that there is some metaphysical doubt as to the material

5  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

6  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct.

7  1356 (citation omitted).

8          On July 2, 2002, the court advised plaintiff of the requirements for opposing a

9  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

10  F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and Klingele v.

11  Eikenberry, 849 F.2d 409 (9th Cir. 1988).

12          *Discussion*

13          Defendants Murphy, Snyder, Lytle and Prado argue that they did not use excessive

14  force in handcuffing plaintiff, whom they contend first did not comply with an order to leave the

15  area and thereafter when they had difficulty handcuffing him, but used reasonable force as

16  preemptive measure before a situation could become more dangerous.  Defendants aver that they

17  are entitled to qualified immunity.

18          Plaintiff argues that he could not leave the area because his way was blocked, that

19  he was rushed by defendants, who used excessive force in pushing him against a wall and

20  causing an injury to his back.

21          It is undisputed that on January 18, 2001, defendants Correctional Officers Prado

22  and Snyder and Correctional Sergeants Murphy and Lytle were engaged in a contraband search in

23  the C-Facility-8 block housing unit of California State Prison - Sacramento.  Also undisputed is

24  that after the search, defendant Murphy told two inmates to follow defendant Lytle and himself to

25  the rotunda area to be counseled concerning proper behavior.  No party disputes that when

26  \\\\\

9

1  defendants Murphy and Lytle and the inmates arrived at the rotunda area, plaintiff was on the

2  phone.

3              At this point, in his opposition, plaintiff disputes defendants' account, continuing

4  to aver that defendants instigated the attack on the inmates.  Defendants, however, in stating that

5  the inmates being counseled instigated an attack, rely, in addition to the declarations of

6  defendants Lytle, Prado and Murphy, upon plaintiff's own deposition, wherein plaintiff states

7  fairly plainly that at least one of the inmates initiated an attack on one of the defendants.  During

8  the deposition, in response to defense counsel's question about the incident with the two inmates,

9  plaintiff responds:

10            A. I don't actually know why the incident – I know what the
              incident was, but I don't know why it happened.
11            I heard them arguing about something, a picture of something or
              something pertaining to that, and they said – I knew – Murphy, *I*
12            *seen them motion Murphy, make a motion, and then next thing I*
              *knew, inmate Heald[7] rushed Lytle into the zone so ....[8]*
13            Q. Did you say a picture?
              A. There was an argument about a picture; that's what I heard.
14            Something dealing with a picture.
              Q. Like a photograph?
15            A. Like a photograph or a painting or something, you know.  I
              heard him say, why did you mess my picture up, or something, you
16            know.
              Q. Oh, so Mr. Hill was upset at the officers for —
17            A. Yeah.
              Q. —messing up his picture?
18            A. Yeah, yeah.

19  Defendants' Exhibit C, plaintiff's deposition (emphasis added), p. 10, lines 2-19.

20            Although, within his complaint and in his opposition, plaintiff contends that

21  defendants Murphy and Lytle initiated a physical assault without provocation upon the two

22

23        [7] The reference to inmate Heald (perhaps a transcription error) is apparently intended to
          be inmate Hill.  Further confusion is added by deposition references to inmate Mill, rather than
24        Hill.  The main point is that there were only two inmates involved in the initial incident; one was
          named Weaver, and the other is variously referred to in the deposition as Mill, Hill or Heald.
25
          [8] Defendant Murphy's own recollection is that inmate Hill swung at him, while the other
26        inmate, Weaver, was the one who attacked defendant Lytle.  Murphy dec., p. 2.

1   inmates, his own sworn deposition testimony apparently belies that allegation, and he offers no

2   explanation for the inconsistency within his opposition.

3           On the other hand, in portions of the deposition testimony *not cited by defendants*

4   (or plaintiff for that matter), plaintiff states that he saw defendant Murphy use his elbow on

5   inmate Weaver during a discussion and, thereafter, inmate Weaver rushed defendant Murphy.

6   Plaintiff's depo, pp. 13-14.  Virtually simultaneously (and in immediate response to defendant

7   Murphy hitting Weaver with his elbow), inmate Mill (Hill, or Heald) attacked defendant Lytle.

8   Plaintiff's depo, pp. 14-15.

9           Plaintiff does assert that the inmates were beaten to the ground by defendants

10  Murphy and Lytle, as well as other correctional officers who are unnamed, and that the inmates

11  were subdued and handcuffed.  Opposition (Opp.), p. 3; plaintiff's depo: pp. 15-16; plaintiff's

12  declaration ¶¶ 6-7, 9.[9]  Plaintiff at a minimum, therefore, asserts that, while the two inmates

13  appeared to him to have rushed the defendants, the attack was not entirely unprovoked; also, he

14  and other inmates were apparently troubled by additional correctional officers joining the

15  defendants in subduing the two inmates.  The court will find as an undisputed material fact that,

16  during the counseling session, the inmates attacked defendants Murphy and Lytle, were taken to

17  the ground, handcuffed and escorted out of C-facility.

18          No party disputes that plaintiff was on the phone in the C-facility rotunda area,

19  was directed to get off the phone and to leave the area.  Plaintiff disputes that he refused to leave

20  the area, but rather contends that defendant Snyder ordered him back into C-section 8-block but

21  that the control officer would not open the door because some 40 inmates had congregated at the

22  door, were agitated and looking through the window.  Plaintiff's decl., ¶ 12.  Defendants do not

23

24          [9] Plaintiff includes as his Exhibit 1, a one-page hand-written partial description of the
    incident involving the two inmates, written at an unidentified time, apparently by one of the two
25  inmates in the original altercation, but not specifically identified.  Not only is it insufficiently
    identified or authenticated, this partial description of events does not appear to comport with the
26  declarations of defendants or any other declaration or explanation by plaintiff.

1   dispute that inmates had congregated at the window and appeared to be agitated and yelling.

2   No party disputes that plaintiff said that what plaintiff had seen staff do to the two inmates was

3   "wrong."

4                Defendants Murphy, Snyder and Prado state that, having subdued two assaultive

5   inmates and because plaintiff was refusing to leave the area, they were unsure of what his

6   reaction might be, so defendant Murphy ordered plaintiff handcuffed as a preventive safety

7   measure.  Murphy Dec., ¶ 6; Snyder Dec.; ¶ 4, Prado Dec., ¶ 7.  Plaintiff does not dispute that

8   defendant Murphy gave the order to handcuff him.[10]  Plaintiff asserts that he was shielded from

9   the incident by Correctional Officer (C/O) J. Moustakas (not a defendant).  Plaintiff's dec., ¶ 8.

10  Although plaintiff fails to provide a supporting exhibit to his opposition in support of this

11  averment, the court located a report, of which it takes judicial notice,[11] that plaintiff had

12  previously submitted as  Exh. 6 to his September 16, 2004 "affidavit in support of plaintiff's

13  pretrial conference."   That exhibit is a January 18, 2001 "supplement to crime/incident report"

14  signed by C/O Moustakas, stating, in relevant part, as follows: "I stayed by the phone area

15  shielding inmate Brownlee [plaintiff] from the incident.  Brownlee made no attempt to get

16  involved and stayed behind me during the incident."  It is plaintiff's contention that he was

17  unable to leave the area and exit through the door to C-section, 8-block because the control

18  officer would not open the door with the agitated inmates crowded there who would not back

19  away from the door.  Plaintiff's Dec., ¶ 12; plaintiff's depo, p. 16, lines 19-25; p. 17, lines 3-6.

20

21       [10] In their statement of undisputed material facts, defendants state as undisputed material
     fact (UMF) no. 8, that it was defendant Murphy who gave the order.  However, at one point in
22   plaintiff's deposition, counsel for defendants asked plaintiff to confirm that defendant Lytle (not
     mentioning defendant Murphy) gave the cuff up order to which plaintiff acceded.  Plaintiff's
23   depo, p. 17, lines 16-18.  Perhaps, the reference to Lytle was inadvertent because earlier in the
     deposition, plaintiff states that it was Murphy who gave the order and re-states that in his
24   declaration in support of his opposition.  Plaintiff's depo, p. 11, lines 15-16; plaintiff's dec., ¶ 15.

25       [11] Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80
     F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126
26   (1981).

1    There is some confusion in this point attributable to defendants.  In defendant

2   Lytle's declaration, he states that at the point when plaintiff states that what he witnessed was

3   wrong, defendant Murphy ordered plaintiff to "'cuff up,'" whereupon plaintiff refused and

4   defendants Snyder and Prado walked toward plaintiff to move him to the far wall and appeared to

5   have difficulty applying the handcuffs, after which defendant Lytle began to walk towards

6   plaintiff.  Defendant Lytle observed defendants Prado and Snyder grab plaintiff's arms and place

7   them up against the wall and then Lytle assisted by grabbing plaintiff's legs, whereupon he states:

8   "I specifically recall grabbing [plaintiff's] right leg and pulling it back towards his buttock area,

9   in an attempt to make him lose his balance so that he would comply."  He further asserts that

10   once plaintiff complied with the cuff up order and relaxed, then defendant Lytle released his leg.

11   Lytle Depo., ¶¶, 6-7.  Defendants also assert in their memorandum of points and authorities that

12   it was defendant Murphy who recalls specifically lifting plaintiff's right leg, citing their own

13   UMF no. 10.  Defendants' Memo., p. 3.  However, this is evidently an error, as UMF no. 10 is

14   supported by the defendants' declarations, wherein it is defendant Lytle who makes that

15   statement.

16    In any event, plaintiff avers that,[12] upon defendant Murphy's giving the cuff-up

17   order, defendants Murphy, Snyder, Prado and Lytle all converged upon him, as well as others

18   unnamed.  Plaintiff's dec., ¶ 16.  All parties agree that defendants Snyder and Prado grabbed

19   plaintiff's arms and pushed him against the wall, that defendants Lytle and Murphy secured

20   plaintiff's legs, and that plaintiff was handcuffed.  Plaintiff, however, contends that he did not

21

22    [12] On this point, C/O Moustakas report offers the following, after observing, inter alia,
that he (Moustakas) saw inmate Hill, "face down on the floor" with "blood on his forehead," then
put on a gurney and rolled out to a clinic: "C/O's E. Prado and T. Snyder began escorting

23   Brownlee back to C-section.  I turned around and started walking out of the block.  I heard Sgt.
Murphy tell C/O's Prado and Snyder struggling to place handcuffs on Brownlee.  I turned around

24   and saw C/O's Prado and Snyder struggling to place handcuffs on Brownlee.  Brownlee was
resisting and saying don't put handcuffs on me.  I saw Sgt. Lytle grab one of Brownlee's legs and

25   lift it up in an attempt to get Brownlee to go to the floor.  The handcuffs were secured by C/O
Prado and C/O J. Sheppard escorted Brownlee out of the block."  Exh. 6 to plaintiff's September

26   16, 2004 "affidavit in support of plaintiff's pretrial conference."

1   resist but was rushed to the wall with his hands pulled behind him by defendants Snyder and

2   Prado and avers that defendants Murphy and Lytle pulled his right leg up as far in the air as they

3   could push it and that plaintiff felt a sharp pain.  Plaintiff's depo., p. 21, lines 1-10, 20-21;

4   plaintiff's dec., ¶¶ 17-18.  Therefore, the material facts that remain in dispute with respect to the

5   excessive force allegations are whether plaintiff defied or ignored the order to retreat by

6   defendants and/or resisted being handcuffed or an order to return to the C-section, block 8, and,

7   thereafter, whether or not the force used to secure plaintiff was reasonable or inappropriate and

8   excessive.

9                          Eighth Amendment-Excessive Force

10              Defendants Murphy, Snyder, Lytle and Prado contend that they are entitled to

11  qualified immunity.  The threshold inquiry in a qualified immunity analysis is whether a state

12  official violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151

13  (2001).  If he officially violated a constitutional right, the court conducts the following two part

14  inquiry to determine if they are entitled to qualified immunity:  1) was the law governing the state

15  official's conduct clearly established; and 2) under that law could a reasonable state official have

16  believed his conduct was lawful?  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th

17  Cir. 2002).

18              In the first step, the court views the record in the light most favorable to the party

19  asserting injury to determine whether the officer's conduct violated a constitutional right.

20  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151.  If the plaintiff establishes the violation of a

21  constitutional right, the court next considers whether that right was clearly established at the time

22  the alleged violation occurred.  Id.  The contours of the right must have been clear enough that a

23  reasonable officer would have understood that what he was doing violated that right.  See

24  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).

25              The court first considers whether defendants' conduct violated a constitutional

26  right.  "[W]henever prison officials stand accused of using excessive physical force in violation

14

1  of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-

2  faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

3  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  When determining whether the force was

4  excessive, we look to the "extent of the injury..., the need for application of force, the

5  relationship between that need and the amount of force used, the threat 'reasonably perceived by

6  the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'"

7  Id., at 7.

8           Plaintiff alleges a back injury that is significant and has caused him pain since the

9  incident in which his right leg was pulled high up behind him when defendants sought to

10  handcuff him following an altercation with two other inmates.  Granting this factor as balancing

11  on the side of plaintiff, the court must assess the need for the application of force.  All parties

12  agree that there was an immediately preceding violent episode between two other inmates and the

13  defendants (and other correctional officers).  Whether provoked or not by defendant Murphy,

14  there is no evidence that disputes that the two inmates in the incident preceding the one primarily

15  at issue, launched a physical attack on defendant correctional officers Murphy and Lytle.  The

16  question for this court is not whether or not this event was one in which defendants, with or

17  without additional correctional officers, overreacted or reacted with excessive force in subduing

18  the two inmates, an issue, even with more evidence, would remain largely irrelevant to this

19  action.

20           The question as to the two inmates in the preceding incident is whether or not the

21  event may have caused defendants to be excessive in the force used in their interactions with

22  plaintiff.  All parties agree that plaintiff told defendants that what he had witnessed was "wrong."

23  It is also undisputed that a number of inmates were massed on the other side of a control door

24  and apparently becoming galvanized by the event.  Although these other inmates had their access

25  blocked, the atmosphere was undoubtedly charged and plaintiff was admittedly upset by what he

26  had witnessed.  Although, as non-defendant Moustakas reported, plaintiff did not make any effort

1  to involve himself in the incident which had just ended, each defendant involved and C/O

2  Moustakas all agree that plaintiff put up some form or degree of resistance to being hand cuffed.

3  See declarations of defendants' Murphy, Lytle, Snyder and Prado.  While plaintiff could not have

4  exited the area since the control door officer was not opening the control door for plaintiff to exit

5  out of the rotunda into the C-section 8-block with inmates crammed around it and looking in

6  through the window, plaintiff's expression of concern for the inmates who had been taken down

7  and his feeling that how the incident had unfolded was "wrong," does not make the precautionary

8  order for plaintiff to be handcuffed unreasonable.  Plaintiff contends that, once the handcuff

9  order was given, he was rushed and pinned to the wall.  Basically, he argues that he was not

10  given the opportunity to comply and was otherwise prevented from leaving the area.  But neither

11  does plaintiff offer any corroboration for his version of events with respect to the hand-cuff order

12  and, in fact, in an earlier exhibit plaintiff offered in support of his position, the non-defendant

13  officer indicated that plaintiff appeared to resist efforts to be handcuffed.

14          Given the charged atmosphere following a violent episode, plaintiff's admission

15  that he expressed his disagreement and was upset with the way officers had handled the

16  preceding incident, that defendants may have been concerned that plaintiff's expression of

17  discontent could have led to his becoming more aggressive and to inciting the inmates viewing

18  the incident, plaintiff's contention that he was unable to leave the area.  In light of the

19  immediately preceding event, perceiving plaintiff's contention that the officers' conduct was

20  wrong, even without conduct that had yet risen to active resistance, while a number of inmates

21  looked on after a violent episode, as a threat, was not an unreasonable perception in the

22  circumstances.  And in light of the fact, that plaintiff does not offer evidence corroborating that

23  he was did not resist the order to be handcuffed, his being pinned to a wall with his leg lifted to

24  unbalance him cannot be said to be unwarranted.  In light of the these circumstances, the need for

25  some amount of force to handcuff plaintiff was, on the face of it, not unjustifiable, and the

26  \\\\\\

1   relationship between that need and the amount of force used does not appear objectively

2   unreasonable.

3           With respect to "'any efforts made to temper the severity of a forceful response,'"

4   plaintiff does not aver that once his leg was lifted, that defendants continued to force it, but that

5   upon its being lifted, the injury was immediately sustained.  The involvement of the four

6   defendants in handcuffing plaintiff was forceful but, if defendants not unreasonably perceived

7   that plaintiff was, at the least, on the threshold of offering resistance in the context of these

8   circumstances, their conduct was not unreasonable.  The court finds that in light of all the

9   circumstances that while the first factor weighs in plaintiff's favor, the remaining factors, in

10  determining whether the force used was excessive, are to be found in favor of defendants

11  Murphy, Snyder, Lytle and Prado.  Therefore, the court will recommend that the motion be

12  granted as to these defendants.[13]

13                      Eighth Amendment - Inadequate Medical Care

14          Defendants argue that there has been no showing that plaintiff was denied

15  inadequate medical care for the injuries he claims to have received on January 18, 2001.  Plaintiff

16  contends that defendant Penner has been deliberately indifferent to his repeated efforts to obtain

17  proper care and treatment for his back injury.

18          As to plaintiff's allegations of inadequate medical care, no party disputes that

19  plaintiff said that he felt back pain on January 18, 2001, after the incident set forth above, nor

20  that plaintiff requested to be seen by a doctor, on January 19, 2001, due to back pain and he was

21

22          [13]  Because the court has found no material issue of fact which would preclude summary
    judgment on the issue of whether a constitutional violation occurred, it is not necessary to discuss
23  at length the subject of qualified immunity.  Suffice it to say that in post-Saucier ([v Katz, 533
    U.S. 194, 121 S.Ct. 2151 (2001), the mere disagreement of the parties on aspects of the facts do
24  not preclude summary judgment.  The court can take the version of the facts favorable to
    plaintiff, but can still conclude that a reasonable prison official, even if mistaken from a
25  Constitutional viewpoint in taking the action he did, may be entitled to qualified immunity.
    Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir.2001).  The undersigned would certainly find that
26  to be the case here.

                                              17

1   seen by a medical technician early that day.  However, plaintiff disputes that he was taken to the

2   medical facility immediately after the January 18, 2001 incident and that he refused all medical

3   treatment.  Opp., p. 4; plaintiff's dec.,  ¶ 20; plaintiff's depo, p. 22.[14]  In support of their assertion

4   that plaintiff was taken to a medical facility post-incident, defendants cite defendant Lytle's

5   declaration (¶ 8); in support of their contention that plaintiff refused treatment, defendants submit

6   a CDC 7219 medical report dated January 18, 2001.  Exh. B to MSJ, p. 41.  The MTA thereon

7   makes a notation that plaintiff refused all treatment.  In any event, the issue of whether or not he

8   was taken immediately to a medical facility on 1/18/01 and/or refused all treatment remains in

9   dispute but the only medical record submitted on the issue supports defendants' position.

10          Although defendants aver that plaintiff's next medical request was made on

11  February 13, 2001, whereupon he was seen by a doctor and provided Motrin, plaintiff alleges that

12  he made a number of requests from January 19, 2001.  Defendants' Exh. B, p. 5, a health services

13  request form submitted by plaintiff on 2/13/01, states that that request is plaintiff's fifth request

14  to see someone about the pain in his back.  Therefore, defendants' averment that his next request

15  after 1/19/01 for medical care occurred on 2/13/01 appears to be disputed on the face of the

16  document they submit in support of  that material fact.  Defendants submit plaintiff's request for

17  medical attention for back pain, signed on February 19, 2001 and May 14, 2001.  Defendants'

18  Exh. B, p. 8.  There is no dispute that plaintiff claims that his back went out on May 8, 2001, that

19  he was seen thereafter by defendant Dr. Penner, who ordered x-rays, provided plaintiff with pain

20  relievers, a walking cane and further diagnostic tests.[15]  The record also shows that he was

21  prescribed Motrin and Robaxin that day.

22  \\\\\

23  _____

24          [14] Again, this page of the deposition is not submitted by defendants in support of their
        motion.

25          [15] Defendant Penner confirms that he saw plaintiff on May 8, 2001.  Penner dec., ¶ 3.
26  Defendants' Exh. B, p. 15, 5/8/01 physician's order, supports plaintiff's assertions that he was x-
    rayed on 5/8/01

1          However, defendants state that plaintiff's medical file indicates that he was first

2    seen by CSP-Sac medical staff on January 24, 2001, when he was provided Motrin for pain and a

3    muscle relaxant, Robaxin.  As plaintiff, himself, on an earlier occasion had submitted the same

4    record on this point, the court takes judicial notice[16] thereof ,and finds that the record submitted

5    indicates that plaintiff was prescribed Motrin on January 24, 2001.  Defendants' Exh. B, p. 17,

6    Penner dec., ¶ 3; see also, plaintiff's Exh. 1 to plaintiff's September 16, 2004 "affidavit in

7    support of plaintiff's pretrial conference."  Plaintiff states that he made repeated requests for

8    treatment for his pain from May 8, 2001 until November 19, 2002, although he submits no

9    supporting exhibits, other than his declaration at ¶ 24.  Defendants' exhibits include as the only

10   (written) medical request made for back pain after his treatment on May 8, 2001, the May 14,

11   2001 request noted previously.

12          Plaintiff's medical records indicate he was seen by the medical department on

13   March 7, 2001, May 11, 2001, May 16, 2001, June 5, 2001, and July 2, 2001,[17] at which

14   appointments[18] plaintiff was provided with Motrin and Robaxin.  Defendants' Exh. B, pp. 17, 27,

15   33.  Defendant Penner states that his review of the medical records indicates that it was he

16   (Penner) who saw plaintiff on April 13, 2001, May 8, 2001, May 16, 2001, June 5, 2001, July 2,

17   2001 and July 30, 2002.  Penner dec., ¶ 3.  On May 11, 2001, plaintiff's lumbar spine was x-

18   rayed, appearing to show degenerative disc disease at the L5-S1 disc, a point with which plaintiff

19   is not in dispute. Defendants' Exh. B, p. 33; plaintiff's dec., ¶ 23.

20

21          [16] Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80

22   F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126
     (1981).

23          [17] Defendants include the following additional dates as treatment visits for which they

24   provide no medical record: March 3, 2001, May 5, 2001, June 6, 2001.  Defendants' UMF no.
     17; Exh. B, pp. 17, 27.

25          [18] The court can find no medical record exhibit in the record submitted in support of

26   defendants' motion for summary judgment that plaintiff was prescribed medication on May 11,
     2001, although defendant Penner makes that declaration.  Penner dec., ¶ 3.

1          On May 16, 2001, plaintiff was also provided, in addition to Motrin and Robaxin,

2   a lumbar support for his back.  In 2002, plaintiff was seen on February 25 and 27, March 4, and

3   July 30, for back pain when he was given Motrin and Robaxin.  Penner Dec., ¶ 7, defendants'

4   Exh. B, pp. 11-14.  On July 30, 2002, plaintiff was provided insoles in response to his back pain

5   complaints.  Def. Exh. B, p. 11.  Because plaintiff did not complain of pain radiating down either

6   leg, further diagnostic testing and treatment were not ordered.  Penner dec., ¶ 6, Exh. B, p. 27

7   (noting, inter alia, in physician's progress notes  "no radiation–anywhere" on July 2, 2001).

8          Plaintiff claims to have felt like a "'lab rat,'" but defendants appear disingenuous

9   in claiming that that statement supports the UMF (no. 22) that the basis for this feeling was "that

10  he received so much medical care."  In fact, the relevant deposition testimony makes clear that

11  plaintiff is saying that his complaints are not being appropriately addressed, that the pills he is

12  being prescribed repeatedly do not alleviate his pain and that whatever test he has had did not

13  lead to pain relief or otherwise ameliorate his condition.  Plaintiff's depo, pp. 33-34.

14         Plaintiff claims that on November 19, 2002, he was sent to Doctor's Hospital of

15  Manteca for an MRI (magnetic resonance imaging) of his lumbar spine, whereupon Dr. Richard

16  Ponzio found that plaintiff had decreased sensation in his right toe and abnormal reflex in his

17  right lower extremity.  Plaintiff's dec., ¶ 25.  He further contends that from November 19, 2002

18  until October 29, 2003, he received, as a result of the report, no treatment for his spinal injury.

19  Id., ¶ 26.  Although plaintiff failed to produce any exhibit in support of his claims in the context

20  of the present opposition, the court has located the relevant exhibit among the documents of

21  which the court has previously taken judicial notice.  Exhibit 3 to plaintiff's 9/16/04 "affidavit in

22  support of plaintiff's pretrial conference" is a November 19, 2002 radiology report from Dr.

23  Ponzio.  The report includes as clinical data plaintiff's reference to decreased sensation in his

24  right toe and abnormal reflex in his right leg.  The report also states "[r]ule out disk disease" but

25  later includes, inter alia, the following "impression": "degenerative disk disease noted at the L5-

26  S1 level, otherwise unremarkable."

1   　　　　Included as Exh. 4 to the 9/16/04 affidavit is the document (designated "progress

2   note") that is the source of plaintiff's declaration (¶ 26) that on October 29, 2003, Morteza Farr,

3   D.O., Doctors Hospital of Manteca, stated that he "would need to see the actual film" of the MRI

4   done on 11/19/02 to make an assessment, but that he does not have it on the 10/29/03 follow-up

5   visit.  The report states, in part, as follows:

6   　　　　The request for a MRI of the lumbar spine was done back on
        11/19/02, however I did not have the chance to get back with him
7   　　　　until now.  The MRI shows degenerative disk disease with annular
        bulge at L5-S1 level, however I have not had the actual MRI to
8   　　　　evaluate.

9   In his assessment, Morteza Farr, states that he would like to follow-up with plaintiff on the next

10   clinic day with the MRI result, but that he "feel[s] that the patient will benefit from a series of

11   lumbar epidural injections in the meanwhile."  He provides the following "plan": "If there is

12   evidence of annular tear and he fails epidural injection he may benefit from a [sic] operative

13   intervention.  I need to see the actual film before I can make that assessment."  Progress notes for

14   10/29/03 indicate plaintiff's "chronic pain" and set forth that as medications: kapotin and

15   vicodin.  Exh. 4 to the 9/16/04 affidavit.

16   　　　　On January 14, 2004, plaintiff transferred to the California Training Facility at

17   Soledad.  Plaintiff's dec., ¶ 28.  Plaintiff again references a report he did not submit in support of

18   his opposition, but which the court has located as Exh. 5 to his 9/16/04 affidavit.  On May 20,

19   2004, the radiology report of another MRI performed on plaintiff was made by a Dr. Stephen

20   Kuo.  Noting that plaintiff had a "[h]istory of lower back pain with right leg radiate, not respond

21   [sic]," Dr. Kuo examined plaintiff for "weakness of right leg."  His "impression" from the

22   findings was that plaintiff suffered from "degenerative osteoarthritic changes on disc disease, L4-

23   L5 and L5-S1"; there was "bulging of annulus seen between L4-L5;" and "right para-central disc

24   protrusion with impingement of nerve root of L-5 on the right side."

25   　　　　Defendants in their motion make no reference to either of the reports from

26   Doctors Hospital.

1  Finally, plaintiff includes as Exhibit 4 that as of April, 2005, he has been issued a
2  six-month CDC 128-C medical chrono, indicating that he has a chronic medical and restricting
3  his physical activity.

4  The most troubling aspect of defendants' showing is that there is no reference to
5  the MRI and follow-up done at Doctors Hospital of Manteca on November 19, 2002 and October
6  29, 2003, respectively.  Nor does defendant Penner demonstrate that any of the recommended
7  lumbar epidural injections were provided to plaintiff following the 10/29/03 visit.  In fact,
8  defendant Penner states only, with reference to 2002, that plaintiff was seen on February 25 and
9  27, March 4, and July 30.  On the other hand, what is primarily at issue in plaintiff's complaint is
10  the medical care, or lack thereof, that he received from January 18, 2001, when his back injury
11  occurred, until the filing of his complaint on January 25, 2002, at which point he claims that he
12  had yet to receive adequate medical treatment for his back injury.

13  *Legal Standard for Eighth Amendment Inadequate Medical Care Claim*

14  In order to state a § 1983 claim for violation of the Eighth Amendment based on
15  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence
16  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.
17  285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively
18  serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,
19  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.
20  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."
21  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

22  A serious medical need exists if the failure to treat a prisoner's condition could
23  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications
24  that a prisoner has a serious need for medical treatment are the following:  the existence of an
25  injury that a reasonable doctor or patient would find important and worthy of comment or
26  treatment; the presence of a medical condition that significantly affects an individual's daily

22

1   activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

2   F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

3   (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

4   grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

5          In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

6   defined a very strict standard which a plaintiff must meet in order to establish "deliberate

7   indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

8   However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

9   which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

10  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

11  should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

12          It is nothing less than recklessness in the criminal sense——a subjective standard——

13  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

14  1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

15  that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

16  114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

17  of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

18  847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

19  knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

20  obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

21  1981.  However, obviousness per se will not impart knowledge as a matter of law.

22          Also significant to the analysis is the well established principle that mere

23  differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

24  Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

25  662 F.2d 1337, 1344 (9th Cir. 1981).

26  \\\\\

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant."  McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference thereby creating a material issue of fact, summary judgment should be entered for defendants.  The dispositive question on this summary judgment motion is ultimately not what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

\\\\\

1          Plaintiff's medical records indicate he was first seen by CSP-Sac medical staff on

2    January 24, 2001, after the January 18, 2001 incident, when he was provided Motrin for pain and

3    a muscle relaxant, Robaxin.  He was also seen by the medical department on March 7, 2001,

4    April 13, 2001, May 8, 2001, May 11, 2001, May 16, 2001, June 5, 2001, July 2, 2001 and July

5    30, 2002.   The dates on which plaintiff was seen by defendant Penner and provided medication

6    for pain were April 13, 2001, May 8, 2001, May 16, 2001, June 5, 2001, July 2, 2001 and July

7    30, 2002.  On May 11, 2001, plaintiff's lumbar spine was x-rayed, appearing to show

8    degenerative disc disease at the L5-S1 disc but no fracture.  On May 16, 2001, plaintiff was also

9    provided, in addition to Motrin and Robaxin, a lumbar support for his back and a cane.  There

10   appears to be a gap after July 2, 2001 until February 25, 2002 where defendants show no records

11   of plaintiff's treatment for the back pain plaintiff claims to have continued to suffer, but, in

12   opposition, plaintiff does not produce adequate evidence of his having sought medical care

13   during this time, nor, more important, does plaintiff show defendant Penner's "deliberate

14   indifference" after January 18, 2001 to the injury he sustained on that date by the evidence set

15   forth by defendants.  The court cannot address whether or not defendant Penner may have been

16   negligent in his treatment of plaintiff's back pain in light of recommendations made by a medical

17   expert in October 29, 2003; defendant Penner has made an adequate showing that plaintiff never

18   complained of radiating pain, which plaintiff has not disputed, that might have alerted him to a

19   different treatment regime.  Plaintiff is also handicapped by the lack of expert testimony –

20   evidence which would be necessary in this case to determine whether Dr. Penner grossly

21   departed from medical norms.  The evidence of plaintiff's individual medical record is not a

22   record of deliberate indifference on the part of defendant.

23         Accordingly, IT IS ORDERED that plaintiff's motion to compel further

24   discovery, filed on April 11, 2005, and his  "notice of failure to comply with discovery,"

25   construed as a motion to compel discovery responses, filed on filed May 27, 2005, are denied.

26   \\\\\

1    IT IS HEREBY RECOMMENDED that defendants' motion for summary

2  judgment, filed on April 14, 2005, be granted and judgment for defendants be entered.

3    These findings and recommendations are submitted to the United States District

4  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5  days after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8  shall be served and filed within ten days after service of the objections.  The parties are advised

9  that failure to file objections within the specified time may waive the right to appeal the District

10 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11 DATED: 1/31/06

12

13                                              /s/ Gregory G. Hollows

14                                              _____
                                                GREGORY G. HOLLOWS
                                                UNITED STATES MAGISTRATE JUDGE

15 GGH:009
   brow0214.msj

16

17

18

19

20

21

22

23

24

25

26